UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Case No. 3:20CR30 (KAD) |
| | : | |
| v. | : | February 15, 2022 |
| | : | |
| DELROY ANDERSON a.k.a. "Max" | : | |

## <u>MEMORANDUM IN SUPPORT OF MOTION FOR PRETRIAL DETENTION</u>

The United States, by and through the undersigned Assistant United States Attorneys, submits this memorandum in support of its motion to revoke Delroy Anderson's conditions of pretrial release and remand him to custody.  The defendant—who is charged as the lead defendant in a conspiracy to commit money laundering and with various substantive counts of money laundering, all related to his illegal narcotics trafficking—was arrested on March 12, 2020.  *See* Docket Entry Number ("Dkt. Entry No.") at 7.  He was released that same day pursuant to a Court order setting strict conditions of pretrial release, including the standard condition that he not violate any law (state or federal); travel restrictions; and restrictions on financial transactions over $1,000.  *See* Dkt Entry No. 8 at 1.  Since his release, the Court has found that Anderson failed to comply with his conditions of release on several occasions.  He has not yet been remanded.

However, the Government recently learned that, throughout Delroy Anderson's time on pretrial release *continuing until as late January of 2022*, the defendant has continued his marijuana business by operating a marijuana "grow farm" in California and has persisted in conducting financial transactions over $1,000 without reporting them as required.  Indeed, as recently as January 21, 2022, Anderson told the owner of the property on which he was growing marijuana that he knew he "could get away with a big grow because of the pandemic."

Given these serious, ongoing violations of the Court's Orders, described in further detail below, as well as the defendant's prior failures to comply with conditions of release, the Government is requesting a hearing on these allegations be scheduled as promptly as possible whereupon Government counsel will request the defendant's immediate remand under 18 U.S.C. § 3148(b) pending trial.

## I.   BACKGROUND AND PROCEDURAL HISTORY

### A.  The Pretrial Bond Proceedings and Anderson's Previous Noncompliance

On February 20, 2020, Delroy Anderson, a.k.a. "Max," was charged by federal indictment with conspiracy to commit money laundering and seven substantive counts of money laundering.  *See* Dkt. Entry No. 1.  He was arrested on March 12, 2020, and, after his initial appearance and arraignment, was released subject to certain conditions.  *See* Dkt Entry No. 8. These conditions included standard ones like that he "not violate federal, state or local law while on release," and certain special conditions including that travel was restricted to the state of Connecticut without prior approval by Probation; that Anderson avoid all contact with any witness, victim, co-defendant or identified suspect; and that any financial transaction over $1,000 per day be brought "in advance if possible, to [the] attention of probation."  *See* Dkt Entry No. 8 at 2.

On December 23, 2020, Magistrate Judge Garfinkel signed a "Petition for Action on Conditions of Pretrial Release" submitted by Probation, ordering a summons so that Anderson would appear for a violation hearing.  *See* Dkt. Entry No. 68.  The basis for that summons was the fact that, over the prior nine months that he had been on pre-trial release, Anderson had not been reporting transactions over $1,000 or travel outside of Connecticut.  *Id.*  The Petition further

stated that, to the Probation Department's knowledge, Anderson was not employed and had not

been employed for some time.  *Id.* at 2.  As the Probation Officer explained:

> [t]he defendant has been engaged in financial transactions which violate his
> conditions of pre-trial release, increase his risk of flight, and raise serious issues as
> to his entitlement to court appointed counsel.  Specifically, as reported by Wells
> Fargo, from June 12, 2020 to September 16, 2020, 152 ATM cash deposits were
> made at various ATM locations on or around the same days.  These deposits totaled
> $81,510 and were made into Mr. Anderson's account on approximately 23 separate
> dates.  The deposits were made primarily at ATMs in Greenwich, Stamford,
> Yonkers and Hewlett, New York.  There were approximately 7 deposits in amounts
> over $1,000, in violation of his release conditions. As indicated, some of these
> deposits were made at ATMs located in New York.  To date, Mr. Anderson has not
> requested, nor has he been approved for travel to New York.  According to the
> Government, there were approximately 38 "peer to peer transfers" into Mr.
> Anderson's account in the total amount of approximately $28,840.28.  The origins
> of the transfers were not clear, though it was noted that the transfers were either
> "from ANDERSON DELROY" or "from MAXMILLION", an alias used by Mr.
> Anderson.  There were approximately 9 transfers in excess of $1,000. According to
> the Government, there were approximately 171 transfers to other subjects via
> Square cash application or via Western Union, in the totaling $62,148.  There were
> approximately 13 transfers in excess of $1,000.  **Notably the majority of transfers
> were made to subjects in California, which the Government believes may be
> going to the continued operation of a grow farm.**  Additionally, there were
> approximately 84 transfers to other subjects via Zelle, totaling $41,500.  **Thirteen
> of these transfers were in excess of $1,000.  Again, the majority of these
> transfers were made to subjects in California.**  Mr. Anderson has also attempted
> to make some 48 financial transactions to recipients in Jamaica, using Western
> Union between August 20, 2020 and September 28, 2020, totaling $19,800.  Almost
> all of these transfers were blocked. Also concerning is that Delroy Anderson has
> made 4 separate purchases throughout this time period to JetBlue, presumably for
> plane tickets. Although we do not yet know the destination of these tickets.  On
> December 15, 2020, Mr. Anderson made contact with the probation department and
> stated that he was just 'leaving his attorney's office.'  **He reported that he had
> started working as a consultant for his own company, Rasta World in June of
> 2020.**  He stated that he was providing his services to "agents of marijuana
> growers."  He related that he recently began to pay himself $1,000 per week from
> these funds. It should be noted that the probation department has not been provided
> any information or documentation with respect to this business and was not
> informed of this employment until December 15, 2020.

*See* Dkt. Entry No. 68 at 2 (emphases added).

A hearing was held on January 8, 2021.  *See* Dkt Entry No. 72.  At the hearing, Judge Garfinkel made clear that the defendant could not continue to operate the Rasta World marijuana consulting business where he was reportedly working as a consultant.  *See* Dkt. Entry No. 96 at 10 ("THE COURT: Ms. Buckley, if he's going to stay out at all, he needs to shut down that business he's doing.").  Judge Garfinkel made a point of emphasizing that Anderson was not to have any contact direct or indirect with marijuana or marijuana sales.

> But I wanted to maybe not only reiterate the conditions that are already in place but to add specifically that **Mr. Anderson have no contact direct or indirect in any way, shape, or form with anybody engaged in the growing, distribution, or sale of marijuana and that and that he not engage in any self-employment unless approved by probation**.  There may be things that he could do in self-employment that would be okay, but I want it to be approved by probation and not a surprise to find out what he's been doing.

*See* Dkt. Entry No. 96 at 14 (bold added for emphasis).

As Judge Garfinkel characterized it during the detention hearing, "[Anderson]'s got to be realistic that  . . . he pushed it as far as he can go and stay out" adding that "it is quite possible that the Government might be considering additional criminal charges."  *See* Dkt. Entry No. 96 at 14-15.  Judge Garfinkel concluded by stating "[i]f the same sort of conduct or any future violations are brought to my attention or the attention of any other judge, it is fairly safe to assume that the next proceeding would end with an order of detention."  *Id.* at 16.  Anderson was not ordered detained, but his bond conditions were modified on that date to make clear that:

> **The Defendant shall not have contact, direct or indirect, with persons who are involved in the growing, sale and distribution of marijuana.**  The Defendant shall not be self-employed unless the employment has been approved by the probation department.   The Defendant shall provide verification of income/financial transactions to the probation department.

*See* Dkt Entry No. 72 at 2 (bold added for emphasis).

On March 26, 2021, another Violation Report was issued by Probation.  *See* Dkt Entry

No. 92.  This time, the Probation Officer noted that, since the January hearing, the Government

had obtained additional records that substantiated the earlier Violation Report.

> These records reflect Mr. Anderson's financial transactions from September 2020
> to January 2021, and provide evidence that Mr. Anderson engaged in conduct and
> activities which violate the conditions of release ordered by the Court. Specifically,
> from September 18, 2020 and January 5, 2021, Mr. Anderson had approximately
> 226 ATM cash deposits totaling $159,980.  All deposits were made at ATM
> branches at various locations throughout CT except the following:
> 1 deposit for $1,800 on 9/2/20 at an ATM in Fort Bragg, CA.
> 12 deposits for $6,580 on 09/30/20 in Hewlett, NY
> 25 deposits for $13,920 between 11/23/20 - 11/27/20 in Stockbridge, GA
> Moreover, there have been cash withdrawals totaling $2,592.98 and approximately
> 562 payment transactions totaling $157,368.94, which included debit card
> purchases, Paypal/Zelle/CashApp transfers and Western Union transfers.
> As previously indicated, Mr. Anderson was Court ordered to report any financial
> transactions over $1,000 to the Probation Department.  Additionally his travel was
> restricted to Connecticut.  The above transactions serve as additional evidence of
> violative behavior throughout his pretrial supervision term.

*Id.* at 2-3.

The Probation Officer further noted that Anderson was unemployed and had provided

banking statements that reflected deposits and withdrawals in varying amounts and that he said

he had asked family members to provide him with $20,000, although no verification had been

received.  *Id.*  However, the Probation Officer did not recommend any further action at that time

in light of Anderson's responsiveness.  *Id.*

Another compliance hearing was held on March 31, 2021, and again on April 30, 2021.

*See* Dkt Entry Nos. 94, 102.  Before the last bond hearing, the Probation Officer submitted a

memorandum to the magistrate judge indicating that:

> Mr. Anderson informed the probation department that he closed his Wells Fargo
> Bank account and no longer receives money through PayPal or any other electronic
> means. He advised that for greater transparency he has asked that his family
> members pay his bills directly. Mr. Anderson provided the names of 15 family
> members that supply a total of $2,950 per month to meet his financial obligations.

He further stated that his monthly bills which included rent, car payment, car insurance, food, cell phone, and $500 in miscellaneous expenses, total $2,920. Mr. Anderson has been asked to provide verification from his family members indicating that they are supporting him financially.  He has stated that he will comply. . . Mr. Anderson provided a banking statement from the Navy Federal Credit Union which reflects a current balance of $5.  He stated that this is his only bank account.  Mr. Anderson has been reminded that he must provide a breakdown of expenditures over $1,000 per day since January 5, 2021 to present day. . . .

Anderson, Delroy: Status Report dated April 26, 2021.

Again, the defendant was not ordered detained.  Anderson remains on pretrial release.  The defendant's trial is scheduled to begin May 18, 2022.  *See* Dkt. Entry No. 157.

**B.  Anderson's Marijuana Farm in Willits, California**

The Government has recently learned of additional information regarding Anderson's noncompliance with his conditions of release as well as additional apparent violations of federal law.  In mid-January of this year, J.C.—who lives California but is willing to testify at any Court hearing in this matter—reached out to the Government regarding J.C.'s property in Willits, California (in the Mendocino Valley).[1]  J.C. explained that Anderson was trying to buy this property from her but ended up essentially leasing it from her for several years, turning the property into a substantial marijuana grow farm.  Critically, this conduct pre-dates and post-dates Anderson's March 2020 arrest in the pending case, including up through as recently as three weeks ago.

*1.  The April 2019 Purchase Agreement*

According to J.C., Anderson initially expressed interest in buying her property, which included approximately 40 acres of land, in early 2019.  The deal was apparently finalized on

---

[1] The location of this marijuana grow farm is different than the multiple grow farms in Santa Rosa, California that Anderson used during the time period alleged in the Indictment. "J.C.'s" identity has been disclosed to defense counsel.

April 26, 2019, when Anderson signed papers indicating that he was putting $210,000 into escrow and she agreed to let him use the property while waiting for the deal to close.  J.C. originally thought that Anderson was buying the property for horses and that any marijuana grown on the property would be minimal, but Anderson subsequently, and contrary to her explicit wishes, turned it into a substantial marijuana grow farm.  Below are excerpts from the original sales document selling the property to "Atkinson Enterprises Inc."

Date   _04/25/2019_   ,                                         ("Landlord")  and
                        _Atkinson Enterprises Inc._             ("Tenant") agree as follows ("Agreement").
1. **PROPERTY:**
    **A.** Landlord rents to Tenant and Tenant rents from Landlord, the real property and improvements described as:
    _____ _Willits, CA  95490_                                                          ( Premises ).
    **B.** The Premises are for the sole use as a personal residence by the following named person(s) **only**: _____
    _____.
    **C.** The following personal property, maintained pursuant to paragraph 11, is included: _____
    _____ or ☐ (if checked) the personal property on the attached addendum is included.
    **D.** The Premises may be subject to a local rent control ordinance _____.
2. **TERM:** The term begins on (date) _____ _April 26, 2019_ _____ ("Commencement Date"). If Tenant has not paid all amounts then due;
(i) Tenant has no right to possession or keys to the premises and; (ii) this Agreement is voidable at the option of Landlord, 2 calendar
days after giving Tenant a Notice to Pay (C.A.R. Form PPN).  Notice may be delivered to Tenant (i) in person; (ii) by mail to Tenant's last
known address; or (iii) by email, if provided in Tenant's application or previously used by Tenant to communicate with Landlord or agent
for Owner. If Landlord elects to void the lease, Landlord shall refund to Tenant all rent and security deposit paid.
    **(Check A or B):**

Date Prepared: _April 25, 2019_ _____
1. **OFFER:**
    **A. THIS IS AN OFFER FROM** _____ _Atkinson Enterprises Inc._ _____ ("Buyer"),
    **B. THE REAL PROPERTY** to be acquired is ██████████████████████ , situated in
    _Willits_ (City), _Mendocino_ (County), California, _95490_ (Zip Code), Assessor's Parcel No._036-190-83-00_ ("Property").
    **Further Described As** _____.
    **C. THE PURCHASE PRICE** offered is _Two Hundred Ten Thousand_ _____
    Dollars $ _210,000.00_ .
    **D. CLOSE OF ESCROW** shall occur on ☒ _May 1, 2019_ (date) (or ☐ ____ **Days** After Acceptance).
    **E.** Buyer and Seller are referred to herein as the "Parties." Brokers are not Parties to this Agreement.
2. **AGENCY:**

Although the escrow for the property was secured by Atkinson Enterprises, Inc., it was Delroy Anderson who negotiated the proposed purchase with J.C.  ██████████████ would testify that, although she knew that Atkinson Enterprises was involved in this real estate transaction, she was not asked to sign any documents and did not see this contract.  According to ████████ , Delroy Anderson went out to see the property on several occasions to negotiate this agreement with J.C.

    Aside from her testimony and documentation, Anderson's involvement with the property and connections with J.C. is further corroborated by documents located during the search of 1455

Washington Boulevard, Stamford when he was arrested in March of 2020 in this case.  Below are some examples.



### 2. Anderson's Payments (or Lack Thereof) to J.C.

Despite Anderson's promises to J.C., the sale did not close in 2019, or indeed ever.  Over the next two and half years, Anderson continued to tell J.C. that he would buy the property, but he had myriad of excuses as to why he could not move forward.  At some point, J.C. negotiated with Anderson so that he paid her a monthly price to stay on the property until he could buy it.  As explained in more detail below, those payments were sent to J.C. via checks, Zelle, Cash App, and through intermediaries.  At various other times, J.C. even met Anderson in person to get rent from him, including in Santa Rosa and New York City in 2019.  Having met Anderson on multiple occasions in person, J.C. was able to identify a picture of him when interviewed this month by the Government.

*First*, Anderson paid J.C. directly by check and CashApp, in contravention of the Court's orders.  For example, bank documents obtained for the defendant's Wells Fargo account ending in 5562 revealed that, on September 20, 2020—six months after his arrest and release in this

case—Anderson wrote two $5,000 checks made payable to J.C. and in the "For" lines wrote

"property":



Anderson also sent J.C. multiple Cash App payments after his arrest in this case and while on

federal pretrial supervision, like the examples below:





*Second*, Anderson also continued to use various intermediaries to send J.C. money, including ██████████████ and one of his ex-wives, C.D. (whose identity is known to defense counsel).  ██████████ sent money to J.C. on Anderson's orders.  The following is an example of a wire transfer in July of 2019 that ██████████ sent to J.C.

| Account Name: ATKINSON ENTERPRISES INC | | | Street Address: 34 E MAIN ST STE 315 | | |
|---|---|---|---|---|---|
| City: SMITHTOWN | State: NY | | Zip: 11787-2804 | Country: USA | Daytime Phone: |
| Primary ID Type: Passport w/Photo | | ID Number: 488117528 | | ID Issue Date: 08/16/2012 | ID Exp: 08/15/2022 |
| Secondary ID Type: | | ID Issuer: | ID Number: | | ID Issue Date: ID Exp: |
| Comments: | | | | | |

**Wire Transfer Information**

| Request Date: 07/03/2019 | Request time: 03:03:49PM Eastern time | Effective date: 07/03/2019 | Wire Type: Domestic |
|---|---|---|---|
| Debit Account #: 625 | Debit Account Type: TOTAL BUS CHK | Available balance: $1,334.24 | Wire Amount (US dollars): $1,000.00 |
| Qualifying Account #: | Qualifying Account Type: | Source of funds: Checking | Wire Fee: $35.00 |
| Currency type to be sent: US Dollars | Exchange rate: N/A | Foreign currency amount: N/A | Amount to Collect (USD): $1,035.00 |
| FX Contract Number: | | | |

**Recipient Account Information**

| Account Name: | | | | | |
|---|---|---|---|---|---|
| Street Address: | | Account Number: 3780164526 | | | |
| | | City: | State: | Zip: | Country: |
| Text to Recipient: | | | | | |

**Receiving Bank Information**

| Bank Name: |
|---|

Moreover, ▮▮▮▮▮ would testify that she went to see the Willits property on multiple occasions in 2019 and 2020, including shortly before ▮▮ and Anderson were arrested in March 2020. Similarly, C.D. sent money to J.C. via Zelle, as reflected in the following examples in February and April 2021:



In April 2021, Anderson acknowledged using intermediaries in his text communications with J.C.  He directed J.C. to call "Will," an individual that J.C. and ▮▮▮▮▮ separately identified as someone who worked on the Willits grow farm.  Anderson also indicated to J.C. that Zelle "only let my wife send 500":



These payments continued until at least November 2021, as illustrated below:



*Finally,* J.C. flew to Santa Rosa in 2019 and to New York in or around October 2019 to collect money from Anderson. ███████ recalled the New York meeting, which involved Anderson, J.C., and one of J.C.'s friends. They had dinner and J.C. received $10,000 in cash as partial payment from Anderson. ███████ recalled that meeting and would be able to testify that she understood, from their conversation, that Anderson had paid J.C. money for the use of his land. She also described how Anderson took out a large quantity of cash from a bank, which he maintained in a pouch, and after Anderson met with J.C. in her hotel room, ███████ no longer saw that pouch.

### 3.  Anderson's Marijuana Grow Operation in Willits, CA

Months after he first began using the property in April 2019, J.C. (who lives some nine hours away from the Willits property) learned that Anderson was running a large-scale marijuana farm.  In recent interviews with the Government, J.C. recounted how she went up to visit her property in the late summer or early fall of 2019 and described seeing three giant white tents and some 800 marijuana plants as well as greenhouses.  She said she had leased to growers before, but they had only grown 25 plants or so.  The size of Anderson's operation and the commercial scale was shocking to her.  J.C. did not observe Anderson personally on the property but there were numerous Jamaican and Mexican nationals working on the property.

When J.C. asked Anderson about the marijuana, he openly admitted that he was growing. At one point, he described to her how his "sister" was helping him transport the marijuana back East by vehicle.  J.C. said that she understood the grow farm be a commercial operation.  J.C. also said that, at that point and at later points, she asked him to stop as she was afraid of financial penalties for an unlicensed grow.  Below is an example of a text messages she sent to him in what she recalls was March 2020 in which she asked him to scale back the operation.



At this point, J.C. was communicating with Anderson using a 475-325-8706 number, which the defendant had told her was his son (Chris Anderson's phone). ███████ does not recognize the number, but said that Anderson had a least three phones at that time.  She also said that Anderson does not have a son named named "Chris."

███████████, who traveled to the grow farm with Delroy Anderson on approximately four occasions reported that during harvest time, she saw the workers box the trimmings from the marijuana into cardboard boxes.  It was her understanding that they were using vehicles to ship the marijuana out of California. ███████ remembered that the volume of marijuana at the Willits grow farm was substantial and equaled or surpassed the amont grown on Wright Road, which was the subject of the 2015 search by the Sonoma County Sheriff's Office.

### 4.    *The 2021 Escrow Agreement*

In July 2021, J.C. became frustrated and posted an eviction notice to get Delroy Anderson off of her property.



She sent this notice to Anderson, who then indicated—*in July of 2021*—that he wanted to buy the property.[2]



---

[2] Anderson was still using the "Chris Anderson" number at this time.

The escrow documents were renewed in August of 2021 when Anderson again insisted that he was going to buy J.C. property.  In this instance, Anderson signed as the "President Rasta World, Inc.," a company for which Judge Garfinkel had explicitly ordered Anderson to discontinue his involvement:

**2. Read it carefully. I/WE ACKNOWLEDGE RECEIPT OF A COPY OF THIS DISCLOSURE AND THE PORTIONS OF THE CIVIL CODE PRINTED ON THE BACK (OR A SEPARATE PAGE).** Buyer/Seller/Landlord/Tenant

☒ Buyer ☐ Seller ☐ Landlord ☐ Tenant _____ Date 8/20/2021
_Delroy Anderson, President Rasta World, Inc._

☐ Buyer ☐ Seller ☐ Landlord ☐ Tenant _____ Date _____

Agent _____ **Coldwell Banker Mendo Realty** _____ DRE Lic. # **02116789**
Real Estate Broker (Firm)
By _____ DRE Lic. # _____ Date 8/19/2021
(Salesperson or Broker-Associate, if any) _____
© 1991-2018, California Association of REALTORS®, Inc.

Anderson also offered to pay J.C. $335,000 at this time.

**A. THIS IS AN OFFER FROM** _Delroy Anderson, President Rasta World, Inc._ ("Buyer"),
**B. THE REAL PROPERTY** to be acquired is _____, situated in
   _Willits_ (City), _Mendocino_ (County), California, _95490_ (Zip Code), Assessor's Parcel No. _036-190-83-00_ ("Property").
   Further Described As _____.
**C. THE PURCHASE PRICE** offered is _Three Hundred Thirty-Five Thousand_ Dollars $ _335,000.00_ .
**D. CLOSE OF ESCROW** shall occur on _____ (date) (or ☒ _30_ **Days** After Acceptance).
**E.** Buyer and Seller are referred to herein as the "Parties." Brokers are not Parties to this Agreement.
**2. AGENCY:**
**A. DISCLOSURE:** The Parties each acknowledge receipt of a ☒ "Disclosure Regarding Real Estate Agency Relationships" (C.A.R. Form AD).
**B. CONFIRMATION:** The following agency relationships are confirmed for this transaction:
   Seller's Brokerage Firm _Coldwell Banker Mendo Realty_ License Number _02116789_
   Is the broker of (check one): ☐ the seller; or ☒ both the buyer and seller. (dual agent)
   Seller's Agent License Number _____
   Is (check one): ☐ the Seller's Agent. (salesperson or broker associate) ☒ both the Buyer's and Seller's Agent. (dual agent)
   Buyer's Brokerage Firm _Coldwell Banker Mendo Realty_ License Number _02116789_
   Is the broker of (check one): ☐ the buyer; or ☒ both the buyer and seller. (dual agent)
   Buyer's Agent License Number _____
   Is (check one): ☐ the Buyer's Agent. (salesperson or broker associate) ☒ both the Buyer's and Seller's Agent. (dual agent)

The following terms and conditions are hereby incorporated in and made a part of the: ☐ Purchase Agreement, ☐ Residential Lease or Month-to-Month Rental Agreement, ☐ Transfer Disclosure Statement (Note: An amendment to the TDS may give the Buyer a right to rescind), ☒ Other _Vacant Land Purchase Agreement_ ,
dated _August 19, 2021_ , on property known as _____
_Willits, CA  95490_
in which _Delroy Anderson, President Rasta World, Inc._ is referred to as ("Buyer/Tenant")
and _____ is referred to as ("Seller/Landlord").

_Buyer to pay for Broker compensation total of 2% of purchase price ($6,750.00)_



These documents were all signed by Anderson.

| Record Tracking | | |
|---|---|---|
| Status: Original<br>8/19/2021 9:28:12 AM | Holder: ████████████@gmail.com | Location: DocuSign |

| Signer Events | Signature | Timestamp |
|---|---|---|
| Delroy Anderson<br>maximillion213@icloud.com<br>Security Level: Email, Account Authentication (None) | [DocuSigned signature]<br>9DE059086C9345D...<br>Signature Adoption: Drawn on Device<br>Using IP Address: 104.226.20.166<br>Signed using mobile | Sent: 8/19/2021 9:47:32 AM<br>Viewed: 8/20/2021 4:13:53 AM<br>Signed: 8/20/2021 4:14:42 AM |

Electronic Record and Signature Disclosure:

Ultimately, Anderson was unable to buy the property and J.C. tried to negotiate with him (still using the Chris Anderson contact) as Delroy Anderson wanted to stay at the property through December of last year.





Nothing worked out however and at the end of last year, J.C. finally gave up and decided to sell the property at a price lower than she expected.

Unfortunately, even after his federal arrest and the bond hearings in this case, Anderson did not stop growing marijuana on the property and continued to use it as a grow farm into 2021. Below are pictures that J.C. took of the property last year, which provide additional evidence of the grow farm.



J.C. also recounted how she had received a letter from the County regarding a marijuana grow at the end of last year.

5. ***The January 2022 Communications and Anderson's Threats*** Anderson's text communications with J.C. continued until at least three weeks ago. In the folllowing exchange *from January of 2022*, Anderson again openly admitted that he was growing marijuana on the property up until the end of 2021. At this point, Anderson was using a 917-597-4067 number that J.C. was provided by him. J.C. would also testify that she knew his voice from meeting with him in person and spoke to him on the telephone when he was using this number.



As Anderson, who it is worth underscoring, *was on federal pretrial supervision*, put it—in

January of 2022—"[w]e only harvested 6 on your property and ten next door . . . *I don't like to*

*hide.  I do what I do.  I run risk.  I'm not afraid at all.  You win you lose.  That's my name that's*

*my game*" (italics added for emphasis).

Anderson's flouting of the law continues until the present as exhibited in the following text messages sent to J.C. just a few weeks ago.




Perhaps more concerning are Anderson's recent threats to J.C., who had given up on trying to sell the property to Anderson and was trying to close with another buyer.  By that point, J.C. had learned about Anderson's previous criminal history.  In response, Anderson texted J.C. the following on January 27, 2022:



J.C. explained that "poor white guys" was a reference to the new people buying her property. J.C. has finally managed to sell the property to new owners, but she said that they have spent an extensive period of time cleaning up the debris left by Anderson's grow farm.

## II.    APPLICABLE LAW

Under 18 U.S.C. § 3148(b), a Court shall revoke a defendant's pretrial release if the Court finds either "(A) probable cause to believe that the person has committed a Federal, State, or local crime while on release; or (B) clear and convincing evidence that the person has violated any other condition of release," § 3148(b)(1), and further finds that "there is no condition or combination of conditions of release that will assure that the person will not flee or pose a danger to the safety of any other person or the community" or "the person is unlikely to abide by any combination of conditions of release."  § 3148(b)(2)(A)-(B).  "Compliance with federal law is a mandatory condition" of release under pretrial supervision.  *United States v. Arizaga*, 2016 WL 7974826, *2 (S.D.N.Y. 2016).

The statute also creates a rebuttable presumption that "[i]f there is probable cause to believe that, while on release," the defendant has committed a felony, there is no set of conditions that will assure that "the person will not pose a danger" to the community. § 3148(b). *United States v. LaFontaine*, 210 F.3d 125, 130 (2d Cir. 2000).  That presumption does not disappear once the defendant has produced some rebuttal evidence, but "continues to be weighed along with other factors."  *United States v. Rodriguez*, 950 F.2d 85, 88 (2d Cir. 1991).

## III.    DISCUSSION

Here, Anderson has exhibited total disrespect for the Court's Orders regarding his conditions of release and, through his continued commercial cultivation of marijuana and potential additional money laundering, is endangering the community.  His new and recent

conduct also evinces his failure to understand the seriousness of the pending charges against him. Anderson has been on pretrial release now for approximately 23 months and it appears that consistently, throughout that time, he has violated his pretrial release conditions.  He is apparently both unable and unwilling to abide by the considered conditions the Court has imposed.

Furthermore, Anderson has been advised on multiple occasions regarding the need to report financial transactions over $1,000; has no legitimate income so it remains unclear where he gets any money other than through the sale and distribution of marijuana; and yet, consistently, also violates this condition of release.  As late of August of last year, he signed documents for a real estate transaction of over $300,000.  Indeed, some two years after his initial federal arrest on the pending charges, Anderson appears to be engaged in the exact same illegal conduct for which he was initially charged.  At this point, permitting Anderson to stay out of jail will send the message to him that he can continue to disregard the law, that he can continue "to get away with it" and that he can continue to play the "game."  His illegal activities and his demonstrated flouting of this Court's Orders must be stopped.

For the foregoing reasons, the Government is requesting a prompt hearing on these allegations and the remand of the defendant to federal custody.

Respectfully submitted,

LEONARD C BOYLE
UNITED STATES ATTORNEY

*/s/ Jocelyn Courtney Kaoutzanis*
JOCELYN COURTNEY KAOUTZANIS
ASSISTANT UNITED STATES ATTORNEY
Federal Bar No. 30426

DAVID T. HUANG
ASSISTANT UNITED STATES ATTORNEY
Federal Bar No. ct30434

United States Attorney's Office
157 Church Street, 25th Floor
New Haven, Connecticut 06510
(203) 821-3700